IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

FELICIA CHRISTIAN, *et al.*,        *

    Plaintiffs,                 *

vs.                                 *          CASE NO. 4:22-CV-62 (CDL)

FORD MOTOR COMPANY,                 *

    Defendant.                  *

_____

O R D E R

Presently pending before the Court are Ford Motor Company's summary judgment motion and Plaintiffs' motion to strike evidence. As discussed below, both motions (ECF Nos. 25 & 35) are denied. The Court will address Plaintiffs' motion to strike Ford's notice of non-party fault (ECF No. 60) in a separate order.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the

outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiffs, the record reveals the following facts.[1]  This action is about a 2001 P207 Ford Explorer Sport Trac, which was manufactured by Ford Motor Company and first sold as new in 2000.  Ford's target understeer gradient for the Sport Trac was 2.4 deg/g, which made it more susceptible to loss of control and rollover than vehicles with higher understeer gradients.  Testing of at least one Sport Trac in December 2000 revealed a much lower understeer gradient of 1.5 deg/g for the test vehicle, which made it even more susceptible to

---

[1] Ford argues that *its* evidence establishes that the Sport Trac was adequately designed.  At trial, the jury may not resolve all the genuine fact disputes in Plaintiffs' favor, but at the summary judgment stage, the Court is required to view the evidence in the light most favorable to Plaintiffs.

Ford also argues that the Court should not consider certain evidence, including (1) a 1981 Ford engineering report regarding the Bronco II, (2) the "Chamberlain document," and (3) a report by Dennis Guenther.  Ford contends that the "Chamberlain document" is inadmissible hearsay, but it is clear that Plaintiffs offer it to prove notice, so the Court may consider it.  Ford argues that the 1981 document regarding the Bronco II and the Guenther report are irrelevant in part because those documents report on testing of vehicles other than the Sport Trac, but Plaintiffs' experts relied on those documents on the issue of Ford's knowledge of how stability influences rollover propensity; such reliance is permitted under Federal Rule of Evidence 703.  In its reply brief, Ford challenges Guenther's methodology and suggests that Plaintiffs' experts should not have relied on any portion of the report, but Ford did not file a motion to exclude the opinions of Larry Wilson, who appears to rely on a small portion of data from the Guenther report.  Based on the present record, the Court declines to exclude Wilson's opinions, including those informed by the Guenther report.

rollover.  In the 1990s and early 2000s, testing of several mid-size sport utility vehicles showed that tested vehicles with an understeer gradient of less than 2.4 deg/g went into oversteer during a rear tire tread separation.  Ford knew of these issues before the Sport Trac at issue here was first sold as new.  Ford also knew before the Sport Trac at issue here was first sold that drivers facing an oversteer situation often lose control of their vehicles and that this risk can be mitigated by increasing the understeer gradient.  Additional testing in 2003 showed that nearly all drivers lost control of their vehicles during a rear tire separation if the understeer gradient was 2.4 deg/g or lower.  Ford did not issue any warnings about these issues for the Sport Trac, nor did it warn of the increased risk of tread separation with aging tires.

Ford knew before 2001 that a vehicle occupant wearing a seatbelt could hit the roof during a rollover crash.  Despite knowing of the rollover risk, Ford did not conduct dynamic rollover testing on the 2001 Sport Trac to determine how the roof would hold up in a real-world rollover crash.  When Ford was testing the P207 Sport Trac, it did do a crush certification test, which revealed that the vehicle did not meet the minimum roof strength-to-weight ratio requirement (1.5) based on the original weight parameters Ford's engineers used and would only meet the requirement if the maximum unloaded vehicle weight was reduced by

100 pounds.  According to Plaintiffs' expert, the P207 Sport Trac, as designed and manufactured, experienced a total collapse of the roof structure over the occupant compartment during testing designed to simulate a real-world rollover.  But if certain elements were reinforced, the roof crush would have been significantly reduced.  Ford did not issue any warnings about these issues for the Sport Trac.

Eddie Christian owned the Sport Trac at issue here.  He loaned it to his grandson Jalin Lawson.  In 2016, Eddie bought three new tires for the Sport Trac and had Farmer's Tire Center mount those tires on the Sport Trac.  Eddie thought that the Sport Trac's spare tire "looked new," so he had Farmer's mount it, too.  Christian Dep. 25:18-21, ECF No. 31.  The spare was a Goodyear tire manufactured in 2001, and it was mounted as the right rear tire on the Sport Trac.  Although Ford knew that tires that are six-plus years old are susceptible to tire tread separation, Ford did not provide a warning of this hazard with the 2001 Sport Trac.  In 2006, based on its research about dangers of tread separation associated with tire aging, Ford began recommending that Ford owners replace their tires after six years.  Ford did not warn owners of pre-2006 Ford models to take older tires out of service.  Christian did not know that an older tire that looks new could still have problems with tread separation.  If he had known, he

would not have had the spare tire mounted on the Sport Trac, and he would not have let Jalin drive the vehicle.

On May 14, 2017, Jalin was driving Eddie's Sport Trac. The right rear tire (the 2001 Goodyear) separated, Jalin lost control of the vehicle, and the vehicle rolled over four times before coming to rest on its roof. Jalin was killed in the crash, and his passenger, Jullia Morris, was injured. Jalin's mother, Felicia Christian, and Morris brought a strict liability and negligence action against Ford, Goodyear, Farmer's, and Eddie Christian in the Superior Court of Clay County on December 12, 2017 and served Ford on December 19, 2017. The Clay County court granted summary judgment in favor of Goodyear and denied Ford's summary judgment motion. Plaintiffs dismissed that action without prejudice and timely filed this renewal action against Ford only on March 23, 2022. Plaintiffs now assert claims for negligent design and failure to warn.

## DISCUSSION

Plaintiffs claim that Ford negligently designed the 2001 P207 Sport Trac because (1) the Sport Trac had a low understeer gradient that made the vehicle difficult to control in the event of a rear tire tread separation and (2) the Sport Trac was top heavy and prone to roll over yet did not have a sufficiently strong roof to prevent collapse and serious injury in the event of a rollover crash. Plaintiffs also assert that Ford did not adequately warn

consumers of these risks, including the risk of rollover crashes caused by the failure of an older tire.

I.   **The Negligent Design Claim**

Ford argues that Plaintiffs' negligent design claim is barred by Georgia's statute of repose for product liability cases.[2]   In general, no product liability action (including a negligence action) may be commenced "after ten years from the date of the first sale for use or consumption of the personal property causing or otherwise bringing about the injury." O.C.G.A. § 51-1-11(b)(2), (c). But the statute of repose does not apply to negligence claims "arising out of conduct which manifests a willful, reckless, or wanton disregard for life or property." O.C.G.A. § 51-1-11(c). The statute of repose does not "relieve a manufacturer from the duty to warn of a danger arising from use of a product once that danger becomes known to the manufacturer." *Id.*

Conduct manifests *willful* disregard for life or property if it involves "an actual intention to do harm or inflict injury." *Ford Motor Co. v. Cosper*, 893 S.E.2d 106, 111 (Ga. 2023) (quoting *Chrysler Corp. v. Batten*, 450 S.E.2d 208, 212 (Ga. 1994)). Conduct manifests *wanton* disregard for life or property if it "is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent." *Id.* (quoting

---

[2] Georgia law applies in this diversity action.

*Batten*, 450 S.E.2d at 212). *Reckless* disregard for life or property is a third "standalone exception to the statute of repose." *Id.* at 114. Conduct manifests reckless disregard if "the actor intentionally does an act or fails to do an act which it is his duty to the other to do," while knowing or having reason to know of "facts which would lead a reasonable person to realize that the actor's conduct not only creates an unreasonable risk of harm to another's life or property but also involves a high degree of probability that substantial harm will result to the other's life or property." *Id.* at 118–19.

Ford argues that the "willful and wanton standard" is not met here. Ford relies on authority establishing that the "willful and wanton" standard cannot be met if the undisputed evidence demonstrates that the product "performed well" on multiple tests required by regulators, if there was no real dispute that the manufacturer "expended considerable effort to ensure that its product was within the guidelines considered by the industry and manufacturers at the time[,]" and if the only evidence of design problems is after-the-fact expert opinion. *Ivy v. Ford Motor Co.*, 646 F.3d 769, 777 (11th Cir. 2011).

Here, viewing the evidence in the light most favorable to Plaintiffs, as the Court must do at this stage in the litigation, a jury could conclude that Ford knew (1) the Sport Trac's target understeer gradient was low, (2) vehicles with comparable

understeer gradients went into oversteer during a rear tire separation, (3) drivers facing oversteer very often lose control of their vehicles, which can lead to rollover crashes, (4) pre-sale testing of a Sport Trac revealed an even worse understeer gradient than the already low target for at least one exemplar of the manufactured product, (5) the loss-of-control and rollover risks can be mitigated by increasing the understeer gradient, (6) pre-sale testing of the Sport Trac did not include dynamic rollover testing despite the vehicle's increased risk of rollovers, and (7) pre-sale testing of the Sport Trac found an inadequate strength-to-weight ratio for the roof and that the minimum 1.5 standard would only be met if the maximum unloaded vehicle weight was reduced by 100 pounds.  In light of this evidence, the Court finds that genuine fact disputes exist on whether Ford acted with willful, reckless, or wanton disregard for life or property in the design of the 2001 P207 Sport Trac.  Accordingly, Ford is not entitled to summary judgment based on the statute of repose.  For the same reason, Ford is not entitled to summary judgment on Plaintiffs' punitive damages claim.

Ford also contends that roof crash tests of a Chevrolet Malibu, a Ford Crown Victoria, a Chevrolet Blazer, and an Isuzu Rodeo establish that head and neck injuries to vehicle occupants in rollover crashes occur before the roof collapses, so Plaintiffs cannot establish that any negligent design of the roof caused

Jalin's death.[3]  But Plaintiffs presented evidence that Jalin's injury would not have been fatal if his occupant survival space had been better preserved.  Accordingly, genuine fact disputes preclude summary judgment on this issue.

## II.  **The Failure to Warn Claim**

In addition to their negligent design claim, Plaintiffs assert that Ford did not adequately warn Sport Trac users about (1) the risk of oversteer and rollover during a tire separation or (2) the risk of separation when using an old tire.  In Georgia, a manufacturer must warn users of "nonobvious foreseeable dangers from the normal use of its products." *Suzuki Motor of Am., Inc. v. Johns*, 830 S.E.2d 549, 557 (Ga. Ct. App. 2019) (quoting *CertainTeed Corp. v. Fletcher*, 794 S.E.2d 641, 645 (Ga. 2016)).  This duty is continuing; the "duty to warn arises whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product." *Batten*, 450 S.E.2d at 211.

Ford argues that failure-to-warn claims based on Ford's failure to warn of the oversteer and rollover risks associated

---

[3] Plaintiffs contend that the "Malibu" and "CRIS" studies are inadmissible because the tested vehicles are not substantially similar to the Sport Trac and because the crash test dummies were not positioned or restrained the way a human occupant would be.  It is the Court's understanding that the studies examined what happens to an occupant during a rollover crash and that Ford's expert relied on the studies to opine that Jalin more likely than not sustained a fatal head injury before the Sport Trac's roof collapsed, so a reinforced roof would not have made a difference to his injuries.  Based on the present record, the Court declines to exclude those studies, so Plaintiffs' current motion to strike them (ECF No. 35) is denied.

with tire separation are merely repackaged design defect claims and that a finding of no design defect disposes of such claims. But, as discussed above, genuine fact disputes exist on whether Ford negligently designed the Sport Trac.  Ford contends that even if this claim is a proper failure-to-warn claim, Plaintiffs did not identify a risk that could be reduced with a proper warning. But they did: Plaintiffs' warnings experts opine that Ford—despite knowing of the Sport Trac's oversteer and rollover hazards, despite providing a general warning about the risk of rollover on the Sport Trac's visor that implied rollovers could be prevented by not driving recklessly, and despite understanding the best way for a driver to respond to an oversteer situation—never provided specific warnings of how to mitigate loss of control or minimize the rollover risk.  These fact disputes create a jury question on this claim.

Ford also argues that it had no duty to warn of the dangers associated with using aging tires on its vehicle because it did not manufacture the tire.[4]  Relying on *Davis v. John Crane, Inc.,*

---

[4] Ford points out that the Clay County superior court judge concluded that *Goodyear* was not required to warn of dangers with its aging tire because of the learned intermediary doctrine.  The superior court judge reasoned that since the tire installer knew of the risks but installed the old spare tire anyway, Goodyear's failure to warn could not be a but-for cause of Plaintiffs' injuries.  Ford argues that this ruling means that Ford should not have an obligation to warn of dangers associated with the tire.  Of course, the superior court judge determined that Ford had a duty to warn of dangers *associated with the Sport Trac*, including dangers of driving the vehicle with old tires.

Ford emphasizes that, in general, a manufacturer is not required "to warn of the hazards in *another* manufacturer's product."  836 S.E.2d 577, 584 (Ga. Ct. App. 2019).  In *Davis*, a boiler operator was injured when he used asbestos-containing replacement parts to repair a boiler.  *Id.* at 580.  Those replacement parts did contain warnings that they contained asbestos.  *Id.* at 581-82.  The boiler operator pursued a failure-to-warn claim against the pump manufacturer, arguing that it was foreseeable that the pump might require asbestos-containing replacement parts made by third parties and that the pump manufacturer should have warned of the hazards of asbestos.  *Id.* at 583-84.  But there was no evidence that the boiler operator was exposed to asbestos contained in the original pump, and the evidence showed that while the pumps could operate with replacement parts that did not contain asbestos, the operator's employer elected to use third-party replacement parts that did contain asbestos (which the third-party manufacturer warned about).  *Id.*  So, although it was foreseeable that some third-party replacement parts might contain asbestos, the pump manufacturer was not required to warn of the risks of asbestos in those products.  *Id.*  In summary, the *Davis* court found no duty to warn about dangers in third-party replacement parts where (1) the replacement parts did not render the manufacturer's product more dangerous and (2) not all replacement parts contained the hazard for which a warning was sought.

The record here, though, reveals a different landscape. Unlike in *Davis*, the issue is not simply whether Ford should warn of a potential defect in a possible replacement part that might be used with one of its products. Rather, the present record suggests that every tire is susceptible to deterioration over time and that old tires decrease the safety of Ford's products. Moreover, Plaintiffs' claim is that Ford failed to warn of dangers with its product—the Sport Trac—and that users should not use *Ford's* product with old tires because *Ford's* product was susceptible to oversteer and rollover in the event of tire separation. Accordingly, the Court rejects Ford's argument that because it is not a tire manufacturer, it had no obligation to warn users of the dangers of using its product with old tires.

Finally, Ford argues that because there is no evidence that Jalin or Eddie read the owner's manual for the Sport Trac, Plaintiffs cannot establish causation for their failure-to-warn claims. Ford points out that where a plaintiff makes a claim based on the inadequacy of the content of a warning but failed to read the allegedly inadequate warning, "the adequacy of the warning's contents cannot be a proximate cause of the . . . injuries." *Camden Oil Co. v. Jackson*, 609 S.E.2d 356, 358 (Ga. Ct. App. 2004). Here, though, Plaintiffs' claim is not that Ford provided an *inadequate* warning of the specific dangers underlying their claims, but that Ford did not provide any warnings of these dangers

12

at all, in the manual or otherwise.  In this type of case, where Plaintiffs challenge the adequacy of the manufacturer's efforts "to communicate the dangers of the product to the buyer or user," failure to read a product manual does not bar recovery. *Key Safety Sys., Inc. v. Bruner*, 780 S.E.2d 389, 392 (Ga. Ct. App. 2015) (quoting *Wilson Foods Corp. v. Turner*, 460 S.E.2d 532, 534 (Ga. Ct. App. 1995)).  Moreover, genuine fact disputes exist on causation because Plaintiffs presented evidence that Eddie would have modified his behavior if Ford had adequately communicated a warning by (1) not having the spare tire mounted on the Sport Trac and (2) not letting Jalin drive the vehicle.  For all these reasons, Ford is not entitled to summary judgment on the failure-to-warn claims.

## CONCLUSION

As discussed above, Ford's summary judgment motion (ECF No. 25) is denied, as is Plaintiffs' motion to strike certain evidence (ECF No. 35).  The Court will address Plaintiffs' motion to strike Ford's notice of non-party fault (ECF No. 60) in a separate order.

IT IS SO ORDERED, this 20th day of December, 2023.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA